**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**STEPHANIE J. CHANEY,**                    Case No. 5:18 CV 2769

       Plaintiff,

       v.                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

       Defendant.                              MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Stephanie J. Chaney ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned reverses and remands the decision of the Commissioner for proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in January 2016, alleging a disability onset date of June 4, 2015. (Tr. 196). Her claims were denied initially and upon reconsideration. (Tr. 118-21, 127-29). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 134-35). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on March 20, 2018. (Tr. 29-74). On May 9, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 12-22). The Appeals Council denied Plaintiff's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on November 30, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1976, Plaintiff was 42 years old on the date of the ALJ hearing. (Tr. 34, 196). She lived with her husband and two teenage children. (Tr. 34). She had a high school education and some technical college training. (Tr. 36). She had previous work as a cashier, postal clerk, pharmacy clerk, shipping/receiving clerk, and retail stocker. (Tr. 64-65). Plaintiff was able to drive, but only short distances. (Tr. 35).

Plaintiff testified she chose the June 4, 2015 onset date because she was in a car accident on that date. (Tr. 41). The crash aggravated her preexisting fibromyalgia. (Tr. 43).

Plaintiff believed she was unable to work due to multiple medical conditions including pain, fibromyalgia, GERD, COPD, depression, and anxiety. (Tr. 42-43). For her fibromyalgia, Plaintiff received IV Lidocaine once per month to numb nerve endings; relief lasted for two to four weeks. (Tr. 44). She also took pain medication. *Id.* Plaintiff agreed with her treating physician's assessment that she would have four bad days per month. (Tr. 54-55).

Plaintiff also experienced depression and anxiety, for which she took medication. *Id.* She also had trouble sleeping. *Id.* Plaintiff had been seeing Dr. Patel and counselor Patti Burdeshaw for approximately five years; prior to the accident her depression and anxiety were "pretty much under control". (Tr. 45). Plaintiff testified to difficulty being around large groups of people, and sometimes even smaller groups. (Tr. 46). She also testified to memory loss and difficulty concentrating. (Tr. 53). On bad days, Plaintiff did "absolutely nothing". (Tr. 54).

On a typical day, Plaintiff got up between 8:30 and 10:30 a.m.; if she had a rough night, sometimes she slept until early afternoon. (Tr. 48). A few days per week, Plaintiff napped for two to five hours. (Tr. 55-56). She let her dog outside and sat on the porch, then watched television or played on her phone. (Tr. 48). She could "not always" follow a television storyline. (Tr. 46-47). She sometimes cooked or swept. (Tr. 48-49). Her children also helped with household chores. *Id.*

Plaintiff also testified to problems with her back and her neck that increased after her accident. (Tr. 50-51). She had previously undergone injections. *Id.* Plaintiff described a stabbing pain in the upper left side of her body (causing headaches) and the lower right side of her body which she rated as usually four to seven out of ten. (Tr. 52).

Plaintiff also had pain and cramps in her side resulting from nerve damage from the removal of a lung bleb. (Tr. 56-57). She also had residual pain and swelling in her right leg (from her hip through her foot). (Tr. 58). Plaintiff couldn't reach overhead and had trouble with her grip ("I drop stuff constantly"). (Tr. 58-59).

Plaintiff estimated she could lift ten pounds, and walk "[m]aybe a block" before having to rest for five to ten minutes. (Tr. 60). She believed she could stand and walk for less than two hours of a workday, and sit or stand for thirty minutes before shifting positions. (Tr. 60-61).

Relevant Medical Evidence

*Physical Health Evidence*

*Prior to Alleged Onset Date*

From June 2014 to May 2015, Plaintiff saw pain management physician, Mark Pellegrino, M.D. (or a physician's assistant in the office). *See* Tr. 444-57, 462-510. She reported moderate to severe pain, and examinations frequently noted sixteen of eighteen fibromyalgia tender points, and

tenderness in the neck and spine. *See id.* Plaintiff underwent monthly Lidocaine injections, as well as steroid injections; she was prescribed Norco among other medications. *See id.*

*After Alleged Onset Date*

In June 2015, Plaintiff was involved in a rear-end car accident in which her chest hit the steering wheel. (Tr. 628). On examination, Plaintiff had tenderness in her cervical spine, chest wall, and upper right abdominal quadrant, as well as pain to palpation in her lumbar spine. (Tr. 648). A cervical spine CT showed no acute fracture, and a head CT was normal. (Tr. 654-55). A chest CT showed an incidental left upper lobe bullous, "being there since 2012, status post thymectomy[.]" (Tr. 629). Plaintiff was discharged with diagnoses of head injury without loss of consciousness, cervical sprain, chest wall contusion, and abdominal contusion. (Tr. 649).

Plaintiff returned to the emergency room four days later, reporting severe generalized pain in her neck and back. (Tr. 599). The examining physician noted Plaintiff had some neck and back muscle stiffness and tenderness, but a negative straight leg raise and full range of motion and strength. (Tr. 599-600). She was prescribed medication. (Tr. 600).

Plaintiff returned to Dr. Pellegrino that same month, reporting increased neck, back, and shoulder pain since the accident. (Tr. 434). On examination, Dr. Pellegrino noted pain in eighteen out of eighteen tender points and pain and tenderness in Plaintiff's spine. (Tr. 436-37). Dr. Pellegrino noted he believed the accident caused new injuries and aggravated Plaintiff's pre-existing conditions; he prescribed Percocet and physical therapy. (Tr. 437). Plaintiff also underwent a steroid injection for her neck pain (Tr. 432), which she reported provided "great improvement" in her neck pain ("about 70% symptom reduction") (Tr. 423). However, she reported her Percocet was not lasting long enough. *Id.* A physician's assistant in Dr. Pellegrino's office observed Plaintiff had full neck range of motion, but tenderness to palpation, as well as pain

in her spine, and eighteen out of eighteen tender points. (Tr. 426-27). She increased Plaintiff's Percocet dosage, and instructed her to remain off work through mid-July to allow her to undergo physical therapy. (Tr. 428). Plaintiff again received intravenous Lidocaine later in June. (Tr. 421).

Plaintiff underwent six physical therapy visits, but stopped in July due to an upcoming surgery. *See* Tr. 527. In early July 2015, Plaintiff underwent a left lung bleb resection surgery. (Tr. 664, 669). She reported constant pain in her neck, shoulders, and back impacting her daily activities to Dr. Pellegrino's office. (Tr. 416). A physical examination revealed similar findings as previously. (Tr. 417-18). A physician's assistant instructed her to resume physical therapy once cleared by her surgeon, and to continue monthly Lidocaine. (Tr. 419); *see also* Tr. 414 (Lidocaine treatment). Plaintiff returned the following month with similar complaints and similar examination findings (Tr. 411-12); she again underwent a Lidocaine treatment (Tr. 407).

In early September 2015, Plaintiff went to the emergency room with right knee pain and swelling. (Tr. 622). An x-ray showed small joint effusion, but no acute fracture or dislocation. (Tr. 624).

Also in September, Plaintiff underwent an initial physical therapy evaluation. (Tr. 833-35). Plaintiff complained of shoulder pain, with the left shoulder pain radiating to her left hand. (Tr. 833). Plaintiff had decreased range of motion and strength. (Tr. 834). The physical therapist recommended therapy two to three times per week for twelve weeks. *Id.* Plaintiff attended three sessions and was discharged because she did not return. (Tr. 526).

Plaintiff continued to see a physician's assistant in Dr. Pellegrino's office monthly through the remainder of 2015. *See* Tr. 385-86, 388-406. Plaintiff reported pain in her neck, shoulder, back, and hips, as well as headaches. (Tr. 388-90, 394-97, 402-05). On examination, she had a normal gait, pain in her joints, pain in her spine, and eighteen out of eighteen fibromyalgia tender points

(Tr. 390-91, 396-97, 404-05); she was treated with Percocet, gabapentin, and Ketorolac injections (Tr. 392, 398, 406), as well as continued Lidocaine injections, which were noted to provide "good pain control for 4 weeks" (Tr. 385, 388, 394, 399).

Plaintiff underwent an arthroscopic knee surgery in February 2016. (Tr. 781). The day after the procedure, Plaintiff was walking without crutches "with minimal complaints" (Tr. 778) and two weeks later she reported less pain, less swelling, and increased flexion (Tr. 775).

She also continued pain management with Dr. Pellegrino's practice in 2016. *See* Tr. 954. She reported neck, shoulder, and knee pain; intravenous Lidocaine and medications, including gabapentin, helped. *Id.* On examination, she had tenderness in her neck, and pain in her spine, but full range of motion in both. (Tr. 955). She again had eighteen out of eighteen tender points. (Tr. 956). A physician's assistant continued medications, including Percocet and gabapentin; she was also referred for a repeat cervical injections. (Tr. 958).

Plaintiff saw Ali Shaker, M.D., in Dr. Pellegrino's practice in February 2016, reporting that June 2015 cervical spine injections gave her 70% pain reduction for about six months. (Tr. 974). On examination, Dr. Shaker found marked tenderness over bilateral C3-4 and C4-5 facet joints to palpation; neck range of motion was normal. (Tr. 976). Dr. Shaker recommended repeat injections (Tr. 977), which he performed the following month (Tr. 460). His diagnoses were cervical spondylosis with C5-6 and C6-7 disc bulges with bilateral C4-5, C5-6, and C6-7 facet mediated neck pain, left "much worse" than right. *Id.*

Later in March, Plaintiff reported that the injections provided 50% symptom reduction and reduced headaches. (Tr. 937). A physician's assistant noted eighteen of eighteen fibromyalgia tender points, as well as neck, shoulder, and back pain. (Tr. 939-40). Plaintiff also reported an emergency room visit for shaking legs with low back pain. (Tr. 937). Through June 2016, she

continued to see a physician's assistant in Dr. Pellegrino's practice who noted similar symptoms and examination findings. *See* Tr. 987-89, 994-98, 1005-06, 1012-14. Plaintiff also continued her monthly Lidocaine injections. (Tr. 943, 991, 1000, 1008). In July, Plaintiff reported "significant ongoing benefit" from her cervical spine injections. (Tr. 1207).

A July 2016 x-ray of Plaintiff's thoracic spine showed no acute process, and minimal degenerative changes. (Tr. 1040). Later that month, Plaintiff underwent thoracic spine injections at T2-5. (Tr. 1200-01). An August 2016 MRI of Plaintiff's thoracic spine revealed disc protrusions at T5-6, T6-7, and T7-8, resulting in mild areas of effacement, as well as multilevel disc osteophytes throughout the thoracic spine. (Tr. 1435). The following month, Plaintiff underwent another injection at T5-T6. (Tr. 1170-72). In November, Plaintiff reported "significant ongoing benefit" from the September injections. (Tr. 1125).

Plaintiff continued to see a physician's assistant in Dr. Pellegrino's practice through 2016. *See* Tr. 1105-26, 1133-41, 1160-69, 1174-77, 1181-93, 1203-14, 1174-77. She reported similar complaints of pain and providers made similar findings. *See id.* Plaintiff also continued to receive her monthly intravenous Lidocaine. (Tr. 1111, 1127, 1155, 1177, 1194, 1214).

In February 2017, Plaintiff underwent a lumbar spine MRI which revealed a disc bulge with a superimposed left foraminal and far left lateral protrusion, which appeared to contact the exiting left L4 nerve root, but no definite cause for Plaintiff's sciatica symptoms. (Tr. 1299).

In March 2017, Plaintiff returned to Dr. Pellegrino's office for mid-back pain, and worsening carpal tunnel syndrome symptoms on the left. (Tr. 1557). She also reported lower back pain. *Id.* On examination, Plaintiff had a normal gait and normal spinal range of motion, but tenderness in her spine and myospasms in all paraspinal muscles. (Tr. 1560). She also had a positive FABER with provocation of buttock pain down bilateral lower extremities to ankles. *Id.*

Plaintiff was noted to have had previous benefit with cervical and thoracic injections. *Id.* Plaintiff wanted to wean off Percocet per her gastrointestinal physician's recommendation. (Tr. 1561). The provider gave her instructions to decrease Percocet, maintain her gabapentin dosage, and noted "IV lido continues to provide significant benefit." *Id.* The following month, Plaintiff requested to return to her previous Percocet dosage because the lower dose was "not effective enough". (Tr. 1539). Examination findings were similar (Tr. 1542), Plaintiff's Percocet dose was increased, and gabapentin continued (Tr. 1543). Plaintiff "request[ed] [a single pole cane] stating she has difficulty ambulating distances and also request[ed] a handicap placard for 6 months." *Id.* The physician's assistant provided prescriptions for both. (Tr. 1544).

Providers in Dr. Pellegrino's office continued to note similar findings through the remainder of 2017. (Tr. 1470-1538, 1586-89). Plaintiff underwent monthly intravenous Lidocaine, reporting two to four weeks of pain reduction after each treatment. (Tr. 1474-75, 1476, 1507, 1513, 1534, 1545, 1551).

In January 2018, Plaintiff reported increased neck and shoulder pain radiating down her left arm and frequent headaches. (Tr. 1582). On examination, Plaintiff had spinal and muscular tenderness, but normal range of motion. (Tr. 1584). She also had "giveway weakness with deltoid strength and finger interosseous muscle strength bilaterally". *Id.* The provider continued medications, and noted Lidocaine "continue[d] to provide significant benefit." (Tr. 1585).

*Mental Health Evidence*

In August 2015, Plaintiff saw Kanubhai Patel, M.D. (Tr. 767). She was taking Valium and Paxil. *Id.* She reported being stressed due to her inability to work, and rated her depression as 8/10. *Id.* On mental status examination, she had a depressed and anxious mood, poor short-term memory, and a restricted affect. (Tr. 768). Dr. Patel diagnosed depressive disorder and generalized anxiety

disorder and assigned a Global Assessment of Functioning ("GAF") score of 60-65. (Tr. 769).[1] He prescribed Paxil for depression, Valium for anxiety, and recommended therapy. *Id.* Plaintiff reported similar symptoms the following month (Tr. 733); she also reported racing thoughts and mental status examination showed poor short-term memory and attention, but "okay" concentration. (Tr. 734). In September, Plaintiff returned to Dr. Patel, who noted Plaintiff's mood was depressed and anxious, but her affect appropriate, and her judgment and insight were good. (Tr. 763). She had poor short-term memory and attention, racing thoughts, and "okay" concentration." *Id*. Dr. Patel diagnosed depressive disorder and generalized anxiety disorder; he continued Valium and Paxil, prescribed medication for insomnia, and assigned a GAF score of 60-65. (Tr. 764). In December, Plaintiff reported worsening stress due to her physical illness and that she needed additional surgeries. (Tr. 719-20). She reported an inability to "shut down" her mind, and on mental status examination, had poor attention/concentration and memory. (Tr. 720). Dr. Patel increased Plaintiff's Paxil dosage and continued Valium. (Tr. 721).

From August 2015 through May 2016, Plaintiff saw counselor Patti Burdeshaw. (Tr. 752-61, 876-89). On mental status examinations, Ms. Burdeshaw frequently noted cooperative behavior, an anxious and depressed mood, and good or fair judgment. *See id.* Plaintiff's affect was at times appropriate, and at other times, depressed, blunted, flat, or constricted. *Id.* Ms. Burdeshaw assigned GAF scores ranging from 55 to 65 and consistently noted Plaintiff was making "some progress." *See id.*

In March 2016, Plaintiff underwent a consultative examination with Bruce Malcolm, Psy.D. (Tr. 784-88). Dr. Malcolm noted Plaintiff was able to drive "so she can manage her own

---

1. *See* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed., Text Rev. 2000) (GAF score of 51-60 indicates moderate symptoms; GAF score of 61-70 indicates mild symptoms).

medical care and appointments." (Tr. 785). Plaintiff reported her psychiatric medications were fairly effective. *Id.* She also reported an inability to concentrate and easy distraction. *Id.* Plaintiff reported daily activities of watching television or playing on her phone, and getting up to let her dog out; she was able to drive and manage her activities, but limited social interactions due to anxiety. (Tr. 785-86). Dr. Malcolm observed Plaintiff's posture and gait were unremarkable. (Tr. 786). On mental status examination, Dr. Malcolm noted Plaintiff's speech was normal, with logical and coherent thoughts; she presented as polite and cooperative. *Id.* Plaintiff had a "somewhat anxious" mood, and "labile, appropriate" affect; "[s]he related in a socially appropriate manner." *Id.* Dr. Malcolm observed "no noticeable nonverbal signs of anxiety during the interview". *Id.* Plaintiff's recent and remote memory "appeared intact" and her attention and concentration "appeared to be low average". (Tr. 786). Dr. Malcolm diagnosed persistent depressive disorder-moderate, and social anxiety disorder. *Id.* He assigned a GAF score of 55. (Tr. 787). Dr. Malcolm observed that Plaintiff's presentation "appeared to be somewhat inconsistent with the reported symptoms and functioning", noting that if her symptom description were accurate, "she would not have been comfortable during the assessment or possibly not able to be here." *Id.*

In September 2016, Plaintiff reported worsening depression due to stomach problems and missing her children's activities due to not feeling well. (Tr. 1101). On examination, Dr. Patel found Plaintiff's speech and thought processes normal, and her judgment and insight were good. (Tr. 1102). Her long-term memory was good, but her short-term was "forgetful" and she was "[e]asily distracted." *Id.* Her mood was anxious, depressed, and stressed, and her affect was appropriate. *Id.* Dr. Patel continued Paxil, Valium, Seroquel and Vyvanse. (Tr. 1103).

Plaintiff returned to see Dr. Patel in December. (Tr. 1095-96). On examination, Dr. Patel noted Plaintiff's short-term memory was impaired, her attention/concentration were "fair", her

mood was depressed, anxious, and stressed, and her affect was appropriate. (Tr. 1096). He assigned a GAF score of 60 and continued Plaintiff's medications. (Tr. 1097). Plaintiff returned two weeks later, reporting increased stress, anxiety, and depression. (Tr. 1093). Dr. Patel observed fair to poor judgment and insight, poor short-term memory, fair long-term memory, poor attention/concentration, appropriate affect, as well as a depressed, anxious, and stressed mood. *Id.* He assigned a GAF score of 60 and continued medications. (Tr. 1094).

Plaintiff returned to Dr. Patel in February 2017, reporting depression, anxiety, poor sleep, and mood swings. (Tr. 1575). Dr. Patel continued Plaintiff's medications and assigned a GAF score of 65 (Tr. 1577). In April, Plaintiff continued to report depression and anxiety. (Tr. 1572). Dr. Patel made similar findings as at previous appointments (Tr. 1573), continued Plaintiff's medications, and assigned a GAF score of 65 (Tr. 1574).

Medical Opinion Evidence

*Physical*

In March 2016, State agency physician James Cacchillo, D.O., reviewed Plaintiff's records and offered an assessment of her physical abilities. (Tr. 87-90). He opined Plaintiff could occasionally lift and carry twenty pounds, and frequently lift and carry ten; she could stand or walk about six hours in an eight-hour workday, as well as sit about six hours in an eight-hour workday. (Tr. 87). Plaintiff had some postural limitations (limited to frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling, and never climbing ladders, ropes, or scaffolds.). (Tr. 88). She was also limited to frequent reaching overhead due to shoulder pain. (Tr. 88-89). Finally, Dr. Cacchillo opined Plaintiff should avoid concentrated exposure to pulmonary irritants, and avoid all exposure to hazards. (Tr. 89).

In July 2016, State agency physician Esberdado Villanueva, M.D., reviewed Plaintiff's records and offered similar limitations to those offered by Dr. Cacchillo. (Tr. 109-12). His opinion differed only in that he believed Plaintiff had no limit on her ability to balance (Tr. 111), and that she should avoid concentrated exposure to vibration. (Tr. 111-12).

In August 2016, Dr. Pellegrino completed a residual functional capacity questionnaire. (Tr. 1027-20). Therein, he noted he saw Plaintiff monthly, and listed diagnoses of cervical and thoracic spondylosis, cervical degenerative disc disease, fibromyalgia, and neuralgia. (Tr. 1027). He opined Plaintiff could walk two city blocks, sit continuously for two hours, and stand continuously for fifteen minutes. *Id.* He stated Plaintiff could sit for at least six hours of an eight-hour workday, and stand/walk for less than two hours. *Id.* He thought Plaintiff could frequently lift less than ten pounds, occasionally lift ten to twenty, and never lift fifty. (Tr. 1028). He also noted she could stoop or crouch less than five percent of a day. *Id.* Finally, Dr. Pellegrino opined Plaintiff would likely miss work more than four times per month as a result of impairments or treatment. *Id.*

*Mental*

The record contains unsigned Mental Status Questionnaire from March 2016. *See* Tr. 707-09.[2] It stated Plaintiff had been seen every two weeks since December 2011, and had a constricted affect and depressed mood, with increased panic attacks, fear, isolation, and daytime sleep. (Tr. 707-08). It stated Plaintiff had good long-term memory, but poor short-term memory; she had poor concentration, poor judgment, and poor insight. (Tr. 707). The medical source statement said Plaintiff could maintain attention "[at] times – for a short time", but could not sustain concentration, or persist at or complete tasks. (Tr. 708). The response to how Plaintiff would react

---

2. Plaintiff asserts this is Dr. Patel's opinion. *See* Doc. 16, at 16. However, the signature line is blank, *see* Tr. 709, and based on handwriting similarities, it appears the form may have been filled out by Ms. Burdeshaw, *compare* Tr. 707-09 *with* Tr. 752-66.

to work pressures was "no"; Plaintiff had no deficiencies in social interaction. *Id.* The same day Dr. Patel signed a daily activities questionnaire stating that Plaintiff could not go in public, that she got along "fair" with her family, but had no friends. (Tr. 710).[3] He stated Plaintiff had a high need for rest, severe anxiety, depression, PTSD, and pain. *Id.* Plaintiff could attend to personal hygiene, but her family took care of chores and errands. (Tr. 711).

After his March 2016 consultative examination, Dr. Malcolm offered a functional assessment. (Tr. 787-88). With respect to Plaintiff's abilities and limitations in understanding, remembering, and carrying out instructions, he stated that Plaintiff "report[ed] that she is having difficulty remembering things lately" but "reported that at her last job understanding and remembering instructions was not a significant limitation." (Tr. 787). Regarding attention and concentration, Dr. Malcolm noted Plaintiff "report[ed] she would sometimes lose her focus while she was working" but the flexibility in her prior job "helped her to keep her work flow moving"; he noted that "[it] seems that she has limitations in maintaining focus however the job she was doing gave her a way to accommodate that." *Id.* Dr. Malcolm further noted that Plaintiff "report[ed] that she had no problems responding appropriately to supervisors or her coworkers" and "respond[ed] to work pressures by taking it home" and did "not deal with it at work with inappropriate behavior." (Tr. 788).

In April 2016, State agency physician Kristen Haskins, Psy.D., reviewed Plaintiff's records and offered a mental residual functional capacity assessment. (Tr. 90-92). She opined there was no evidence Plaintiff had any limitation in her ability to remember locations, work-like procedures, or to understand, remember, or carry out short and simple instructions. (Tr. 90-91). She also noted

---

3. Based on the handwriting, it appears this form was likely completed by Ms. Burdeshaw and signed by Dr. Patel. *Compare* Tr. 710-11 *with* Tr. 752-66.

Plaintiff was not significantly limited in her ability to understand and remember detailed instructions. (Tr. 90-91). Regarding concentration and persistence, Dr. Haskins opined Plaintiff "retain[ed] the ability to perform routine, short cycle work in an environment without need for fast pace." (Tr. 91). Dr. Haskins also opined Plaintiff did not appear to have significant limitation in social interaction, and could "respond appropriately to changes in the work setting, as long as changes are foreseen"; she "would need major changes to a set work routine explained in advance and slowly implemented to allow [her] time to adjust to the new expectations." (Tr. 92).

In July 2016, State agency reviewing physician Cynthia Waggoner, Psy.D., affirmed Dr. Haskins's opinion. (Tr. 112-14).

Also in July 2016, Dr. Patel signed a Mental Status Questionnaire form. (Tr. 1017-19).[4] Therein, Dr. Patel described Plaintiff's ability to maintain attention, sustain concentration, complete tasks, react to work pressures, or adapt, to be "poor". (Tr. 1018). The response to a question to describe any deficiencies in social interaction is "social interaction ∅". *Id.* A daily activities questionnaire completed the same day states that Plaintiff's frequent sleep, increased depression, and increased anxiety might interfere with her ability to work. (Tr. 1020).

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 63-72). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 65-67. The VE responded that such an individual could not perform Plaintiff's past work, but could also perform sedentary unskilled jobs such as bench assembler, order clerk, or surveillance system monitor. (Tr. 66-67). The VE

---

4. Again, Ms. Burdeshaw may have completed this form; Dr. Patel signed it. *See* Tr. 1019.

also testified that being off-task more than ten percent of the day (Tr. 72) or absenteeism of more than a day to a day-and-a-half per month (Tr. 68-69) are work-preclusive.

ALJ Decision

In her May 9, 2018 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through September 30, 2018, and had not engaged in substantial gainful activity since her June 4, 2015 alleged onset date. (Tr. 14). The ALJ determined Plaintiff had severe impairments of fibromyalgia, irritable bowel syndrome, degenerative disc disease, obesity, shoulder impingement, depressive disorder, and anxiety disorder; however, none of these impairments – individually or in combination – met or medically equaled the severity of a listed impairment. *Id.* The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional limitations. The claimant can frequently reach overhead to the left and right. The claimant can frequently climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can frequently balance, stoop, kneel, crouch, and crawl. The claimant can never work at unprotected heights or around moving mechanical parts. She must avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants. The claimant can only occasionally work around vibration. She is limited to simple and routine tasks.

(Tr. 16). Given Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff could not perform her past relevant work, but there were jobs that existed in significant numbers in the national economy that she could perform. (Tr. 19-20). Therefore, the ALJ found Plaintiff not disabled. (Tr. 21).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred in her evaluation of the opinion evidence. Specifically, she contends the ALJ's handling of Dr. Pellegrino's and Dr. Patel's medical opinions violated the treating physician rule. For the reasons discussed below, the undersigned affirms the ALJ's consideration of Dr. Pellegrino's opinion, but reverses and remands for further explanation of her consideration of Dr. Patel's opinion.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[5] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques;

---

5. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in January 2016 and thus the previous regulations apply.

and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, she is not required to perform an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

An ALJ's brief explanation may satisfy the good reasons requirement, if that brief analysis touches on the required factors. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). However, a conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as

'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

*Dr. Pellegrino*

The ALJ explained his consideration of Dr. Pellegrino's opinion as follows:

On August 11, 2016, Dr. Pellegrino from Ohio Pain opined that the claimant can sit for at least 6 hours in an 8-hour workday but stand and walk for less than 2 hours in an 8-hour workday. He also opined that the claimant would miss more than 4 days of work each month due to the severity of her symptoms or for medical treatment. Despite Dr. Pellegrino's status as a treating source, his opinion cannot be given controlling weight because it is not entirely consistent with the record. The amount of medical appointments the claimant attended throughout the period of adjudication have not been so numerous as to suggest she could not sustain full-time employment. Furthermore, the objective medical evidence does not support Dr. Pellegrino's finding that she is unable to stand and/or walk for at least 2 hours in an 8-hour workday or that the severity of her symptoms would prevent her from engaging in full-time employment. However, as discussed above, the medical evidence does support a sedentary RFC. Therefore, some weight is given to Dr. Pellegrino's opinion. (Exhibit 20F)[.]

(Tr. 19).

Plaintiff first takes issue with the ALJ's rationale that her number of medical appointments "have not been so numerous as to suggest she could not sustain full-time employment" as a reason to discount Dr. Pellegrino's absenteeism opinion. She contends that "[i]f one focuses only on treatment administered by Dr. Pellegrino and Dr. Patel . . . it is clear that Chaney saw a physician 30 times between June and December 2015, 40 times in 2016, and 23 times in 2017." (Doc. 16, at 21). She then cites the VE's testimony that missing more than "a day to a day and a half a month, 18 days out of the year total" is work-preclusive. *Id.* The undersigned finds the ALJ's discounting of Dr. Pellegrino's absenteeism opinion supported by substantial evidence because, as the Commissioner points out, 1) there is not evidence that these appointments could not be scheduled around work hours, and 2) Plaintiff had many regular appointments prior to her alleged onset date

and maintained full-time work. Many of these appointments, indeed, were brief appointments, such as for monthly intravenous Lidocaine. *See, e.g.*, Tr. 385, 388, 394, 399, 407, 421, 943, 991, 1000, 1008, 1111, 1127, 1155, 1177, 1194, 1214, 1474-75, 1476, 1507, 1513, 1534, 1545, 1551. As the Tenth Circuit has explained: "[P]laintiff's current extrapolation of how many days she must have missed from work based on her medical record is faulty . . . in that it assumes she was required to miss entire days of work for each appointment." *Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000); *see also Pryor v. Comm'r of Soc. Sec.*, 2015 WL 12683977, at *7 (E.D. Mich.) ("Pryor has not established any reason to think that he is unable to attend physical therapy sessions after work, on the weekends, during lunch, or on some other schedule."), *report and recommendation adopted*, 2015 WL 6735336; *Leaverton v. Colvin*, 2013 WL 1316901, at *3 (N.D. Okla.) ("Plaintiff added up the number of doctor visits and phone calls to his doctor he made over the pendency of this case and argues that number of absences would preclude employment. Nothing in the record suggests an entire day off is necessary for each appointment or that appointments could not be scheduled around hours of employment."); *Brock v. Astrue*, 2008 WL 4104551, at *16 (W.D. Mo.) ("Further, the fact that a claimant must attend regular healthcare appointments does not necessarily indicate that she cannot work; there is nothing in the record to indicate that Brock could not schedule her appointments around her work schedule.").

Second, Plaintiff contends the ALJ's blanket statement that the objective evidence does not support Dr. Pellegrino's opinion regarding standing and walking is "too vague". (Doc. 16, at 22). To be sure, the Sixth Circuit has explained that an ALJ may not "dismiss a treating physician's opinion as 'incompatible' with other evidence of record" without "some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*, 375 F. App'x at 552. However, the Sixth Circuit has also

explained that an ALJ's reference to inconsistency with the medical evidence "as discussed above" is sufficient when it was "clear which evidence [the ALJ] was referring to". *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016).

Here, in her analysis of Dr. Pellegrino's opinion, the ALJ referenced "the objective medical evidence" as inconsistent with the limitation to standing and walking for less than two hours per day, and noted that "[h]owever, as discussed above, the medical evidence does support a sedentary RFC." (Tr. 19). The undersigned finds this sufficiently specific (as it was in *Hernandez*) to indicate the ALJ was referring to the extensive analysis of Plaintiff's physical impairments – including her daily activities, and accounting for Plaintiff's fibromyalgia pain – set forth on the two prior pages. *See* Tr. 17-19. In this analysis, the ALJ analyzed the objective medical evidence and its relatively consistent, and often normal findings. *See id.* Further, the ALJ recognized that, even though there were often normal objective findings, Plaintiff's "fibromyalgia would contribute to the severity of [her] symptoms, as well as cause fatigue" and thus "[gave] her some benefit of the doubt and limited her to work at the sedentary level." (Tr. 18); *see also* Tr. 19 (assigning "limited" weight to the State agency physicians' opinions that Plaintiff could perform light work because, *inter alia*, "fibromyalgia may contribute to the severity of her symptoms"). The ALJ also considered Plaintiff's daily activities earlier in her opinion (including driving, participating in household chores, and an ability to perform personal care tasks), noting they were "inconsistent with the alleged severity of the claimant's symptoms." (Tr. 17).[6]

Thus, the undersigned finds no error in the ALJ's consideration of Dr. Pellegrino's treating physician opinion. The ALJ considered the consistency and supportability of the opinion and the

---

6. The undersigned therefore finds no merit to Plaintiff's argument in Reply that the ALJ failed to appropriately consider Plaintiff's fibromyalgia and improperly focused solely on the objective evidence.

provided reasons are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4).[7]

*Dr. Patel*

The ALJ explained her consideration of Dr. Patel's July 2016 opinion as follows:

On July 6, 2016, Dr. Patel complete a mental status questionnaire. Dr. Patel noted an impaired mental status that included -- impaired speech, a depressed mood, a labile affect, panic and fear, poor concentration, and poor focus. Dr. Patel opined that the claimant's ability to maintain attention is poor, her ability to complete tasks and concentrate is poor, and her ability to adapt is poor. (Exhibit 19F)[.] Despite her status as a treating source, Dr. Patel's opinion cannot be given controlling weight or even great weight for several reasons. First, the opinion is inconsistent with Dr. Malcolm's objective findings. The opinion is also inconsistent with Dr. Malcolm's opinion. Finally, Dr. Patel's opinion is inconsistent with her own objective observations discussed above, and found in Exhibits 14F, 19F, 22F, and 35F[.]

(Tr. 19).

Plaintiff first contends the ALJ erred in failing to "weigh the March 1, 2016 treating physician opinion." (Doc. 16, at 23). However, because the March 2016 opinion is unsigned, *see* Tr. 709, the undersigned finds no error in the ALJ's failure to discuss or assign weight to this "opinion". An unsigned opinion necessarily raises the question of who completed the form, their qualifications, and the length of any treatment relationship. And, as noted above, a comparison of the handwriting suggests it was likely completed by Ms. Burdeshaw, meaning there is no evidence

---

7. Moreover, this case is similar to *Hernandez*. There, the Sixth Circuit found it was "nearly impossible to analyze whether this is true [the evidence was inconsistent] because [the physician's] check-box analysis is not accompanied by any explanation." *Id.* Thus, the court in *Hernandez* held: "Even if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error because the [medical source statement] here is 'weak evidence at best' and meets our patently deficient standard." *Id.* at 474–75 (citing *Friend*, 375 F. App'x at 551). Similarly here, Dr. Pellegrino simply made an "x" indicating Plaintiff could stand/walk for less than two hours in an eight-hour workday and provided no further explanation except for listing Plaintiffs' diagnoses. *See* Tr. 1027-29.

it was entitled to treating opinion deference. *Compare* Tr. 707-09 *with* Tr. 752-66. Furthermore, the March 2016 questionnaire (Tr. 707-09) contained answers similar to those in Dr. Patel's July 2016 opinion (Tr. 1017-19), which the ALJ did weigh. Thus, any error in failing to mention the March 2016 opinion is, at most, harmless error.

Plaintiff next contends that the ALJ's reasons for discounting Dr. Patel's July 2016 opinion do not satisfy the regulatory "good reasons" requirement. The undersigned agrees. Preliminarily, Plaintiff is correct that an ALJ may not discount an opinion merely because it conflicts with another opinion. *See Gayheart*, 710 F.3d at 377. The ALJ here did not discount Dr. Patel's opinion solely because it conflicted with Dr. Malcolm's opinion; she provided two additional reasons – she noted it was inconsistent with Dr. Malcolm's objective findings on examination, and inconsistent with Dr. Patel's own objective findings. *See* Tr. 19. These considerations – consistency and supportability – are required regulatory factors to be evaluated in weighing opinion evidence. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."); 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

However, the ALJ's reasons are not supported by substantial evidence. First, it is inconsistent to discount Dr. Patel's opinion on the rationale that it is "inconsistent with Dr. Malcolm's opinion", when in the paragraph prior, the ALJ noted Dr. Malcolm's opinion was "vague" and that his functional opinion consisted of Dr. Malcolm "repeat[ing] several of the claimant's subjective allegations – not actual opinions." (Tr. 19). Second, the ALJ cited Dr.

Malcolm's opinion as inconsistent with Dr. Patel's opinion, but did not explain further. This might be a supported rationale – both physicians opined Plaintiff had limitations in concentration, but Dr. Malcolm's "vague" opinion might be read to imply a lesser degree of limitation than Dr. Patel's. But this is not explained by the ALJ herself.

Third and most problematically, the ALJ stated that Dr. Patel's opinion was "inconsistent with [his] own objective observations discussed above, and found in Exhibits 14F, 19F, 22F, and 35F." (Tr. 19). This can be a valid reason for discounting a treating physician's opinion. *Leeman v. Comm'r of Soc. Sec.*, 449 F. App'x 496, 497 (6th Cir. 2011) ("ALJs may discount treating-physician opinions that are inconsistent with substantial evidence in the record, like the physician's own treatment notes."). On the prior page the ALJ described Plaintiff's treatment with Dr. Patel as follows:

> On April 21, 2016, the claimant's psychiatrist, Dr. Kanubhal Patel, noted a casual and neat appearance. The claimant was cooperative and fully oriented. Unfortunately, her mood was anxious and depressed and her affect was constricted. (Exhibit 14F8). In December 2016, Dr. Patel administered an MSE and made the following objective observations: The claimant's speech and thought processes were intact. She was fully oriented with an appropriate affect. However, her short-term memory appeared diminished and her mood was depressed and anxious. Additionally, her attention and concentration were impaired. (Exhibit 22F2-5). On April 18, 2017, a progress note from Dr. Patel notes some ongoing short-term memory loss. However, the mental status was otherwise within normal limits – including attention, concentration, mood, and affect (Exhibit 35F).

(Tr. 18). The first note the ALJ attributes to Dr. Patel is actually a counseling note from Ms. Burdeshaw. *See* Tr. 881. The second note cited, from December 2016, appears fairly consistent with Dr. Patel's opinion. *See* Tr. 1093 (listing poor short-term memory, poor attention/concentration, and fair to poor judgment and insight). And the third note cited, from April 2017, is inaccurately described. *See* Tr. 1573. The ALJ correctly noted that the record states Plaintiff continued to have some short-term memory impairment, but she incorrectly stated that

24

Plaintiff's attention and concentration were normal. (Tr. 18). In fact, in the cited record, under attention/concentration, Dr. Patel wrote "[e]asily distracted", not normal. *Id.* Moreover, a review of Dr. Patel's other treatment notes reveals similar findings. *See, e.g.*, Tr. 768 (poor short-term memory, "okay" attention/concentration); Tr. 763 (poor short-term memory, poor attention, "okay" concentration).

It is not enough for the ALJ to simply state that treatment records are inconsistent; there must be some explanation of how they are inconsistent. *See Friend*, 375 F. App'x at 552. As noted above, at times, it is unnecessary to repeat an analysis of the records when it is clear to which records the ALJ is referring, and that analysis provides a sufficient explanation of the ALJ's consideration of a treating physician opinion. Given the errors in the ALJ's earlier discussion of Dr. Patel's treatment notes – which she then attempted to incorporate by reference in support of her reasons for discounting Dr. Patel's opinion – and the other consistent records, the undersigned finds this reason provided by the ALJ not supported by substantial evidence.

There may well be substantial evidence in the record to support discounting Dr. Patel's opinion. Here, the ALJ may have found that it was a difference of degree – that Dr. Patel's opinion was a more extreme representation of Plaintiff's limitations than his treatment notes, or the other evidence of record. But it is not for this Court to attempt to provide that analysis after the fact. The purpose of the treating physician rule is two-fold. First, the explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Second, requiring an explanation "ensures that the ALJ applies the treating physician rule and permits meaningful

appellate review of the ALJ's application of the rule." *Id.* The ALJ's decision fails to satisfy these dual purposes as to Plaintiff's mental impairments As such, remand is required.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned reverses and remands the Commissioner's decision denying DIB pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

 s/ James R. Knepp II
United States Magistrate Judge